# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

PRINCE JACOBS,

                                 Plaintiff,

v.                                                          Case No. 14-CV-1016-JPS

CITY OF MILWAUKEE POLICE
DEPARTMENT, ABC INSURANCE
COMPANY, and JOSE RAMIREZ,
                                                                    ORDER

                                 Defendants.

The plaintiff, Prince Jacobs ("Jacobs"), alleges, in the main, that Milwaukee Police Officer Jose Ramirez ("Officer Ramirez") intentionally destroyed exculpatory evidence, and that the loss of that evidence resulted in the plaintiff serving nearly five months in the Milwaukee County Jail for a crime he did not commit. (Docket #17 at 1). The plaintiff alleges that because Officer Ramirez had a duty to preserve and disclose exculpatory evidence under, *inter alia*, *Brady v. Maryland*, 373 U.S. 83 (1963), and failed to do so, Officer Ramirez violated the plaintiff's Fourteenth Amendment right to due process.[1] (*See* Docket #1 at 7-8). The plaintiff also brings claims for false arrest and malicious prosecution under federal law and false arrest/false imprisonment under state law against Officer Ramirez. *Id.* at 6, 8-9.

The plaintiff moved for partial summary judgment (as to liability only) on his Fourteenth Amendment due process claim. (Docket #16). The defendants cross-moved for summary judgment on all of the plaintiff's claims. (Docket #23). Those motions are now fully briefed (*see* Docket #17, #24, #28, #31) and ready for disposition.

---

[1] For consistency and clarity, the Court will refer to this claim as the plaintiff's *Brady* claim.

The Court will grant the plaintiff's motion for partial summary judgment and deny the defendants' motion for summary judgment, for the reasons discussed below.

1.    FACTS[2]

In the early morning hours of September 8, 2013, two juvenile males, J.N. and D.K., reported that they were robbed by two men, one of whom was armed with a shotgun. (Docket #18 at ¶ 12). The robbery occurred in the 3200 block of North 12th Street in the City of Milwaukee. (Docket #26 at 4). That same day, Officer Ramirez responded to J.N. and D.K.'s house to investigate the robbery. (Docket #18 at ¶ 13). During Officer Ramirez's investigation, he obtained a description of the two suspects from J.N. and D.K., and Officer Ramirez also learned from J.N. and D.K. that the two suspects were individuals J.N. and D.K. had purchased drugs from in the past. *Id.* at ¶ 14-15.

After speaking with J.N. and D.K., Officer Ramirez went to the area of the robbery. *Id.* at ¶ 16; He indicates that he went to that area because J.N. and D.K. had indicated that drugs were sold in that area, *id.* at ¶ 18, and *not* because he was investigating the robbery, *id.* at ¶ 19. When Officer Ramirez arrived at the robbery location, he observed between four and six African-American males. *Id.* at ¶ 21. Among those individuals were the plaintiff and Devonte Walker ("Walker"). *Id.* at ¶ 22-23. Officer Ramirez detained all of the individuals and placed two of those individuals—one of whom was the plaintiff—in the back of his squad car. *Id.* at ¶ 24.

---

[2]The facts are taken from the plaintiff's proposed findings of fact in support of his motion for partial summary judgment  (Docket #18), except where properly objected to (*see* Docket #26). The defendants did not file proposed findings of fact.

While in Officer Ramirez's squad car, the plaintiff informed Officer Ramirez that he would like to speak with him in private. (Docket #18 at ¶ 26). After the other individual exited the car, the plaintiff informed Officer Ramirez that his family often provides information to the police about the neighborhood. *Id.* at ¶ 27. And, to that end, the plaintiff wanted to provide Officer Ramirez with information about guns and drug activity in the area. *Id.* Aware that a shotgun was used in the robbery of J.N. and D.K., Officer Ramirez asked Jacobs if he knew anyone with a shotgun; however, Officer Ramirez stated that he was not in fact investigating the robbery. *Id.* at ¶ 28. In response to Officer Ramirez's question, the plaintiff stated that Walker owned a shotgun. *Id.* at ¶ 29. At the end of their conversation, the plaintiff and Officer Ramirez exchanged phone numbers; they would later text each other, with Jacobs providing Officer Ramirez with additional information about criminal activity in the area. *Id.* at ¶ 30.

Officer Ramirez released all individuals he had detained (including the plaintiff) and entered each of their names into his computer system to pull up their booking photos. *Id.* at ¶ 31. He then took a picture of each of the booking photos with his cell phone's camera. *Id.* at ¶ 32. Officer Ramirez then returned to J.N. and D.K.'s house to find out if either of them could identify the individuals in the booking photos. *Id.* at ¶ 33. Officer Ramirez showed J.N. and D.K. the photos on his cell phone—*i.e.* photos of booking photos from his computer screen—and asked them if they recognized any of the individuals as a person they had purchased drugs from. *Id.* at ¶ 34. After viewing the photographs on Officer Ramirez's cell phone, J.N. and D.K. indicated that at least one of the individuals looked familiar; however, Officer Ramirez did not document who J.N. and D.K.

Case 2:14-cv-01016-JPS   Filed 09/01/15   Page 3 of 24   Document 33

identified. *Id.* at ¶ 37-38.[3]   While J.N. and D.K. stated that at least one individual looked familiar, neither of them positively identified anyone from the booking photos, including the plaintiff. *Id.* at ¶¶ 39-40. At this time, then, the plaintiff was not implicated in the robbery of J.N. and D.K. *Id.* at ¶ 41.

Soon after Officer Ramirez showed J.N. and D.K. the photos on his cell phone, he intentionally deleted all of the photos from his cell phone; he did not print or otherwise preserve the photos he showed to J.N. and D.K. *Id.* at ¶ 42. Officer Ramirez also did not document or disclose in his original report that he had conducted this on-the-fly photo array and identification with J.N. and D.K. *Id.* at ¶ 43.

That same night—the night of September 8, 2013—Milwaukee Police Department ("MPD") officers searched the home of Walker, the individual Jacobs identified as having a shotgun. *Id.* at ¶ 44. The search was based on information provided by a different informant, and perhaps also based on the plaintiff's identification of Walker. *Id.* at ¶ 45.[4] The search of Walker's home turned up a large amount of marijuana and a shotgun. *Id.* at ¶ 46.

The next day, Walker was interviewed about the marijuana and shotgun found at his house; he was not questioned about the robbery of J.N. and D.K. at that time, because he was not a suspect. *Id.* at ¶¶ 47-49. After this first interview of Walker, MPD officers began to think that Walker and the plaintiff may be responsible for the robbery of J.N. and D.K. *Id.* at ¶ 50-51. The genesis of that belief, however, is unclear. *Id.* at ¶¶ 50-51.

---

[3]The parties contest the quality of the photographs on Officer Ramirez's phone. (*See, e.g.*, Docket #26 at 8).

[4]The parties dispute whether the search of Walker's home was based in part on the information provided by the plaintiff. (*See* Docket #26 at ¶¶ 44-45).

MPD officers and an ATF agent then interviewed Walker again, this time questioning him about the robbery. *Id.* at ¶ 53. Walker was shown a picture of the plaintiff early on in the interview. *Id.* at ¶¶ 54-55. Eventually, Walker admitted that he used the shotgun found in his home during the robbery of J.N. and D.K. *Id.* at ¶ 55. Walker also implicated the plaintiff in the robbery. *Id.* As a result of Walker implicating the plaintiff in the robbery, a "felony want" for the plaintiff was placed that same day; this information was also passed to the DOC because the plaintiff was on extended supervision. *Id.* at ¶¶ 57-58. A Violation of Probation ("VOP") hold was thereafter placed on the plaintiff by his probation agent who sought to revoke the plaintiff's extended supervision. *Id.* at ¶ 59.

Based on the information provided by Walker, Officer Ramirez was instructed—that same day, September 9, 2013—to compile a photo array with the plaintiff as a target and show the array to J.N. and D.K. *Id.* at ¶ 61. At this point, Officer Ramirez still had not disclosed that J.N. and D.K. had previously seen a photo of the plaintiff during his cell phone lineup, nor had Officer Ramirez disclosed that J.N. and D.K. *did not* positively identify the plaintiff during the cell phone lineup. *Id.* at ¶¶ 60, 62.

Officer Ramirez and his partner went to J.N.'s residence to show him two separate photo arrays—one with the plaintiff as the target, and one with Walker as the target. *Id.* at ¶63. Only the plaintiff and Walker appeared in both the original cell phone lineup and the subsequent photo arrays. *Id.* at ¶ 65. The image of the plaintiff in the second photo array was the same booking photo shown to J.N. and D.K. the day before. *Id.* at ¶ 67. J.N.

positively identified the plaintiff as one of the perpetrators of the robbery. *Id.* at ¶ 82.[5]

On September 11, 2013, Milwaukee Assistant District Attorney Thomas Potter ("ADA Potter") was presented with the cases against the plaintiff and Walker. *Id.* at ¶ 82. ADA Potter charged the plaintiff with armed robbery, party to a crime. *Id.* at ¶ 86. The decision to charge the plaintiff was based on Walker implicating the plaintiff in the robbery, and J.N.'s positive identification of the plaintiff from the photo array. *Id.* at ¶ 87. ADA Potter was not aware, at the time he charged the plaintiff, of the cell phone pictures shown to J.N. *Id.* at ¶¶ 88-89. After being charged with the robbery, the plaintiff was arrested that same day and the VOP hold placed on him prevented the plaintiff from being released on bail during his pretrial detention. *Id.* at ¶¶ 96-97.

After the plaintiff was charged, but prior to the preliminary hearing, ADA Potter was contacted by an MPD detective and warned that something was not right about the case against the plaintiff. *Id.* at ¶ 98; (*see also* Docket #19, Ex. 3 (hereinafter "Potter Deposition") at 45:24-48:7). As a result, ADA Potter took the unusual step of interviewing J.N. and D.K. about the robbery. *Id.* at ¶ 100. The interview took place on October 3, 2013, *id.*, and among those present were MPD Detective Mary Schmitz ("Detective Schmitz") and the plaintiff's attorney in this matter. (Docket #19, Ex. 6 (Schmitz Deposition) at 8:13-9:8). During that interview, ADA Potter learned for the first time that

---

[5]There were other issues with the photo arrays of Walker and Jacobs that are not relevant to the summary judgment motions before the Court (*see* Docket #18 at ¶¶ 68-81), for reasons that will be explained more fully below. In addition, it is not entirely clear why D.K.—the older brother—did not participate in this photo array, or any later lineup, for that matter.

Officer Ramirez had shown J.N. and D.K. images on his cell phone in an attempt to identify the robbery suspects. *Id.* at ¶ 101.

After the interview with J.N. and D.K., Detective Schmitz contacted Officer Ramirez to tell him that he should have documented the photo array and that he needed to file a supplemental report addressing his actions. *Id.* at ¶ 103. On October 4, 2013—the day after the interview with J.N. and D.K.—Officer Ramirez filed a supplemental report describing his use of the cell phone images during his initial contact with J.N. and D.K. *Id.* at ¶ 104; (*see also* Docket #19, Ex. 14). The report states, *inter alia*, that J.N. and D.K. "recognized some of the subjects in [Officer Ramirez's] photos from hanging out in the area," but "were unable to give [Officer Ramirez] any additional information on any of the subjects nor did they positively identify any of the subjects as being involved in th[e] robbery." (Docket #19, Ex. 14).

After learning of Officer Ramirez's actions, the plaintiff's attorney filed two motions to suppress J.N. and D.K.'s identification of the plaintiff, arguing that Officer Ramirez's actions violated the plaintiff's due process rights. *Id.* at ¶ 110. A motion hearing was held on January 9, 2014, and completed on January 31, 2014; on the latter date, J.N. appeared in court to testify about Officer Ramirez's use of the cell phone pictures. *Id.* at ¶ 113. J.N. testified that the plaintiff was not involved in the robbery and was the wrong person. *Id.* at ¶ 115. The plaintiff was eventually released on February 10, 2014 after spending nearly five months in jail. *Id.* at ¶¶ 117-18.

During his deposition, ADA Potter stated that the cell phone lineup Officer Ramirez used was "problematic," and was information that he needed to know at the time of charging (Potter Dep. at 73:15-74:17) because it was "potentially exculpatory." *Id.* at 54:2-55:3, 59:13-19. Additionally, ADA Potter stated that: if he had known about Officer Ramirez's cell phone lineup,

he would have interviewed J.N. and D.K. before proceeding with charging, *id.* at 62:8-64:8, 76:10-77:9, so as to determine "whether or not he could still rely on the [second] traditional…DOJ-approved identification procedure." *Id.* at 64:9-65:1. But, according to ADA Potter, "it would have been a problem," regardless because "any time you see a picture of a potential suspect before a procedure, you worry about taint," *id.* at 65:1-4, and ADA Potter "really needed [the second] identification" because he "didn't have much, if anything else, to provide that corroboration." *Id.* at 66:23-67:4; *see id.* at 67:12-14 (stating that he "would have wanted something more than just an accomplice").

As noted above, the plaintiff filed a complaint alleging that Officer Ramirez: (1) violated the Fourth Amendment by falsely arresting the plaintiff; (2) violated his right to due process under *Brady* by destroying and concealing exculpatory evidence; (3) is liable for malicious prosecution under state law; and (4) is liable for false arrest/false imprisonment under state law. (*See* Docket #1).

The Court begins by setting out the legal standard for summary judgment.

2.      SUMMARY JUDGMENT LEGAL STANDARD

When a party files a motion for summary judgment, it is their "contention that the material facts are undisputed and the movant is entitled to judgment as a matter of law." *Hotel 71 Mezz Lender LLC v. Nat. Ret. Fund*, 778 F.3d 593, 601 (7th Cir. 2015) (citing Fed. R. Civ. P. 56(a)). "Material facts" are those facts which "might affect the outcome of the suit," and "summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Thus, to have a genuine dispute about a material fact, a party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 474 U.S. 574, 586 (1986); namely, the party in opposition "must set forth specific facts showing that there is a genuine issue for trial," Fed. R. Civ. P. 56(e).

"Where…the movant is seeking summary judgment on a claim as to which it bears the burden of proof, it must lay out the elements of the claim, cite the facts it believes satisfies these elements, and demonstrate why the record is so one-sided as to rule out the prospect of a finding in favor of the non-movant on the claims." *Hotel 71 Mezz*, 778 F.3d at 601. When analyzing whether summary judgment should be granted, a court must draw all reasonable inferences from the materials before it in favor of the non-moving party. *See Johnson v. Pelker*, 891 F.2d 136, 138 (7th Cir. 1989). When a court denies a motion for summary judgment it "reflects the court's judgment that one or more material facts are disputed or that the facts relied on by the motion do not entitle the movant to judgment as a matter of law." *Hotel 71 Mezz*, 778 F.3d at 602.

3.      DISCUSSION

The plaintiff has moved for summary judgment on his second claim—that Officer Ramirez's actions violated his Fourteenth Amendment right to due process—as to the issue of liability only. (*See* Docket #17). The defendants have moved for summary judgment on all of the plaintiff's claims. (*See* Docket #27). The Court will discuss the plaintiff's motion first, before turning to the defendants'.

### 3.1    The Plaintiff's Motion for Summary Judgment

The plaintiff argues that he is entitled to partial summary judgment on his *Brady* claim because it is undisputed that Officer Ramirez intentionally destroyed the cell phone images that he showed J.N. and D.K. and Officer Ramirez had a duty to disclose that information under a long line of Supreme Court cases concerning exculpatory evidence. (Docket #17 at 12-13). As the plaintiff frames the issue, the only question "for this Court to determine is whether the destroyed evidence was 'exculpatory,'" because the plaintiff was clearly injured—he spent nearly five months in jail for a crime he did not commit.  *Id.* at 13. And, the plaintiff argues that ADA Potter's testimony shows that the photos were exculpatory because "if he had known about Officer Ramirez's actions and [J.N.'s] inability to identify Jacobs, he would not have charged Jacobs." *Id.* at 17.

Officer Ramirez argues in opposition (and in his motion for summary judgment), that while "Jacobs has alleged in conclusory fashion that Officer Ramirez destroyed exculpatory evidence, the facts…establish at best only that Officer Ramirez concealed such evidence." (Docket #31 at 7). As Officer Ramirez sees it, the exculpatory evidence was not the images themselves, but "the victims' inability to identify the persons in those images," and that evidence was never destroyed. *Id.*

Even if the Court finds that the images were exculpatory, Officer Ramirez's argument continues, the plaintiff "cannot show that [Officer Ramirez's deletion of them] is the proximate cause of any claimed injury," because ADA Potter's testimony does not show that he would not have charged the plaintiff; instead, according to Officer Ramirez, ADA Potter merely stated that he would have followed up with the victims. *Id.* at 7, 10-11. Finally, while Officer Ramirez concedes that the plaintiff "can show that

there was a clearly established right not to have exculpatory evidence destroyed in bad-faith," *id.* at 12 (citing *Armstrong v. Daily*, 786 F.3d 529, 556-57 (7th 2015)), he argues that this is irrelevant because the plaintiff does not have a destruction of exculpatory evidence claim. Thus, Officer Ramirez argues that he is entitled to qualified immunity. *Id.*

### 3.1.1 *Brady* Claim Legal Standard

"A *Brady* violation occurs when the government fails to disclose evidence materially favorable to the accused." *Mosley v. City of Chi.*, 614 F.3d 391, 397 (7th Cir. 2010). The right provided by *Brady* is "one that 'the Constitution provides as part of its basic fair trial guarantee.'" *Saunders-El v. Rohde*, 778 F.3d 556, 561 (7th Cir. 2015) (quoting *United States v. Ruiz*, 536 U.S. 622, 626 (2002)) (internal quotation marks omitted).

The Seventh Circuit *had* consistently declined to answer whether a defendant who was acquitted (or had charges against him dismissed) could ever bring a *Brady* claim. *See Saunders-El*, 778 F.3d at 562 (declining to answer whether "a trial that results in an acquittal" can ever "produce a valid *Brady* claim"); *Alexander v. McKinney*, 692 F.3d 553, 556 (7th Cir. 2012) (noting that the court has "expressed doubt that an acquitted defendant can ever establish the requisite prejudice for a *Brady* claim") (citing *Bielanski v. Cnty. of Kane*, 550 F.3d 632, 644 (7th Cir. 2008)); *Ray v. City of Chi.*, 629 F.3d 660, 664 (7th Cir. 2011); *Mosley*, 614 F.3d at 397-98 ("[W]e reserve the question of whether our circuit recognizes a claim for a *Brady* violation when the trial results in an acquittal for a later case…."); *Carvajal v. Dominguez*, 542 F.3d 561, 570 (7th Cir. 2008); *Huon v. Mudge*, 597 Fed. Appx. 868, 874 (7th Cir. 2015).

In May of this year, however, the Seventh Circuit answered that question, at least in part, by holding that a criminal defendant may bring a

*Brady* claim for bad-faith destruction of exculpatory evidence, no matter the procedural stage the criminal case ultimately reached, because "the outright destruction of exculpatory evidence raises immediate constitutional concern." *Armstrong*, 786 F.3d at 552. As Judge Hamilton observed, while *"Brady* did not announce a duty to preserve evidence, a duty to refrain from bad-faith *destruction* flows necessarily, and obviously, from its familiar holding that *suppression* of material exculpatory evidence violates due process." *Id.* at 550.

To sustain such a claim, however, a criminal defendant must establish not only that the exculpatory evidence was lost or destroyed, but also that he or she suffered injury because of that destruction. *Id.* at 553. The length of a criminal defendant's detention does not alone suffice to show the required injury, *see id.* at 555 (citing *Garcia v. City of Chi.*, 24 F.3d 966, 971-72 (7th Cir. 1994)); instead, the criminal defendant must show that his detention was "caused by the unconstitutional act," namely, the destruction of exculpatory evidence, *id.* This "causation" element requires the "plaintiff [to show] 'that if all parties had known some piece of exculpatory evidence, the prosecution would not have moved forward with the charges, the grand jury would not have indicted [the plaintiff], or the trial court would have granted a motion to dismiss the indictment.'" *Id.* at 553 (quoting *Mosley*, 614 F.3d at 397). Stated another way, the evidence needs to be "materially favorable," *Mosley*, 614 F.3d at 397, and had that evidence been disclosed in a timely manner, the criminal case against the plaintiff would have faltered from the beginning or soon after disclosure.

As the Seventh Circuit noted in *Armstrong* and *Bielanski*, the answer to the larger question of whether a defendant who is acquitted or has charges against him dropped can bring a *Brady* claim for failure to *disclose* evidence,

remains unsettled across circuits. *Armstrong*, 786 F.3d at 555; *Bielanski*, 550 F.3d at 644 ("Several of our sister circuits to consider the question have concluded that a *Brady* claim is extinguished when a defendant is acquitted or charges are dropped."); *see also Saunders-El*, 778 F.3d at 561-62 (noting that "at least the Sixth, Eighth, Tenth, and Eleventh Circuits have held that a trial that results in an acquittal can never produce a valid claim" and citing those cases).

In 2014, the Ninth Circuit held that, in certain circumstances, an acquitted defendant or one who has had charges dismissed against him, can bring a Fourteenth Amendment due process claim for failure to disclose materially exculpatory evidence. *See Tatum v. Moody*, 768 F.3d 806, 819-820 (9th Cir. 2014). In *Tatum*, the Ninth Circuit permitted a criminal defendant to pursue a due process claim for twenty-seven months of pretrial detention that would not have occurred if "significant exculpatory evidence" had been disclosed by law enforcement to prosecutors. *Id.* The Ninth Circuit resolved the appeal without deciding "the scope and protections established by *Brady* and its progeny," instead grounding the right in a different line of Supreme Court due process reasoning—namely, that in *Baker v. McCollan*, 443 U.S. 137, 145 (1979). *Tatum*, 768 F.3d at 816. The court "emphasize[d] the narrowness of the constitutional rule" it was enforcing, which is restricted to:

> detentions of (1) unusual length, (2) caused by the investigating officers' failure to disclose highly significant exculpatory evidence to prosecutors, and (3) due to conduct that is culpable in that the officers understood the risks to the plaintiff's rights from withholding the information or were completely indifferent to those risks.

*Id.* at 819-20.

Having set out the legal landscape applicable to the plaintiff's *Brady* claim, the Court now turns to applying the foregoing to the instant case.

### 3.1.2    The Plaintiff is Entitled to Summary Judgment on His Fourteenth Amendment Claim

At the outset, the Court notes that *Armstrong*—the case that undoubtedly controls the instant matter—was handed down the day before the plaintiff filed his brief, and was thus not addressed in any of the plaintiff's submissions. The defendants did, however, address *Armstrong* in their combined reply/response brief. (*See* Docket #31).

While acknowledging that *Armstrong* controls, the defendants argue that *Armstrong* states that: (1) "exculpatory evidence that is merely concealed and not destroyed is not recognized as a basis for a *Brady* claim," and (2) "exculpatory evidence that is destroyed forms the basis of a *Brady* claim only when it causes an injury, that is, only when it is a proximate cause of an injury such as charging or incarceration" (Docket #31 at 7). And, because the plaintiff can show neither, the defendants argue, the plaintiff's *Brady* claim must fail. *Id.* at 8 ("Whether Jacobs' claim is properly viewed as merely the concealment of exculpatory evidence or the destruction of exculpatory evidence,…*Armstrong* does not support that either claim is viable."). The Court agrees with the defendants that *Armstrong* stands for those general propositions, but finds, despite the defendants' arguments to the contrary, that the plaintiff *has shown* a *Brady* violation and thus is entitled to partial summary judgment on this claim.

The Court finds that the images on Officer Ramirez's cell phone were—*standing alone*—exculpatory evidence. The defendants argue that those images, by themselves, were just images and did nothing to dispel or confirm the plaintiff's guilt. This is nonsensical. As ADA Potter stated in his

deposition, showing those images to J.N. and D.K., regardless of the non-identification, "caused [him] to think this could be a big problem," because there is no way to know the procedure Officer Ramirez used and whether it was fair. Potter Dep. at 51:12-55:3. By intentionally deleting those images, Officer Ramirez compounded the problem and violated MPD's eyewitness identification procedures. (*See* Docket #19, Ex. 12 at 4) ("Preserve the photos and the order in which they were presented to the witness and place these photos in MPD inventory.").

Lacking the images (and with only a detail-challenged supplemental report), it is unclear: (1) *how* and in what order Officer Ramirez presented the images to J.N. and D.K.; (2) whether the images were similar in size and quality; and (3) whether there were differences in appearance among the individuals that would have made one individual stand out from the rest (and thus cause J.N. to falsely identify an innocent man as the perpetrator). If that were not enough, MPD's own eyewitness identification procedures instruct officers to "[a]void multiple identification procedures in which the same witness view the same suspect more than once," (Docket #19, Ex. 12 at 4), which is exactly what occurred here. And, all of these things bear on the exculpatory value of the cell phone lineup, as well as the reliability of J.N.'s later identification of the plaintiff. *See, e.g.,* Kenneth A. Deffenbacher, Brian H. Bornstein, & Steven D. Penrod, *Mugshot Exposure Effects: Retroactive Interference, Mugshot Commitment, Source Confusion, and Unconscious Transference*, 30 LAW AND HUMAN BEHAVIOR 306 (2006) (noting that "prior mugshot exposure decreases accuracy at a subsequent lineup" and the "type of exposure" and number of mugshots shown to the witness (the first time) are "statistically reliable moderators of the effect of mugshot exposure" on the accuracy of the witness at a later identification attempt); The Honorable

Stuart Rabner, *Evaluating Eyewitness Identification Evidence in the 21st Century*, 87 N.Y.U. L. REV. 1249, 1264-66 (2012) (describing the system variables that bear on eyewitness identification— one of which is multiple viewings—and describing how those variables can undermine witness reliability and result in false identifications).

True, Officer Ramirez did disclose in a supplemental report his *use* of a cell phone lineup and J.N. and D.K.'s inability to positively identify anyone from that lineup, but that was: only *after* the defendant had been charged and spent nearly a month in jail; and only *after* the information came to light during ADA Potter's interview with J.N.; and only *after* Officer Ramirez was *specifically instructed* by Detective Schmitz—more than once (*see* Schmitz Dep. at 16:13-17:25, 19:12-18))—to copy/download all of the images on his cell phone that he showed to J.N. and D.K. So, Officer Ramirez may have filed the supplemental report, but he did not—and *could not ever*—comply with Detective Schmitz's instructions to disclose (copy/download) the images, *because he intentionally deleted them.*

Now, to be sure, Officer Ramirez was not required, under *Brady*, to "accurately disclose the circumstances of his investigation" or "creat[e] exculpatory evidence," *see Saunders-El*, 778 F.3d at 562—*i.e.*, the supplemental report—but *he was required* to preserve and disclose, instead of destroy, the cell phone photo lineups he used. Simply put: Officer Ramirez's late-in-time supplemental report simply cannot cure the destruction of the images. *See Armstrong*, 786 F.3d at 550 ("*Brady* would mean nothing if…a prosecutor could comply with its command by deliberately destroying exculpatory evidence and then disclosing the fact of destruction to the defense.").

In reality, there were two pieces of exculpatory evidence, here: (1) the cell phone lineup Officer Ramirez used—including the booking photo of the

plaintiff—which undermines J.N.'s later identification of the plaintiff because J.N. was presented—a second time—with the same image of the plaintiff with different "non-target individuals"; and (2) the fact that J.N. was unable to identify the plaintiff during the cell phone lineup. The latter is of course exculpatory, *see Hart v. Mannina*, — F.3d —, No 14-1347, slip op. at 31 n.1 (7th Cir. Aug. 17, 2015) ("Whether recorded or not, any time a witness is presented with a photo array, is asked to identify a suspect, and then fails to identify the suspect, if anyone in the photo array is later prosecuted, he will be entitled under *Brady v. Maryland*…to know about the non-identification."), but not necessarily more so than the former, as the defendants would have it. This is confirmed by the Court's discussion, above, and ADA Potter's deposition testimony, which raises a whole host of reasons why the images themselves were potentially exculpatory, (*see* Potter Dep. at 52:3-55:3), regardless of whether J.N. did or did not positively identify the plaintiff.

Turning then to whether the plaintiff has shown that Officer Ramirez's destruction of the cell phone images caused him injury, the Court finds that the he has. The defendants' main argument against causation is that ADA Potter stated that, "if he had known of the earlier display of the cell phone photos that would not have deterred him from charging Jacobs, depending on the 'follow-up interview with the victims.'" (Docket #31). And, the defendants argue that ADA Potter "certainly has never acknowledged that he would not have charged or continued to pursue charges based only on the circumstances that the digital images from the cell phone had been deleted." *Id.*

The defendants' parsing of ADA Potter's deposition, and tone-deaf reading their own quotes, do not support their contention that the plaintiff's injury was not caused by Officer Ramirez's deletion of the cell phone images.

First, ADA Potter stated "without question," that "[a]nybody who is going to try a case would want to know if the first photos were seen on a smartphone" and that an officer's use of that technique "without thinking it through and getting prior approval" was a "mistake." (Potter Dep. at 54:13:55:3). And this was true "regardless of how the [victim] reacts." *Id.* at 57:19.

Second, and consistent with ADA Potter's words, his statement that he would have interviewed J.N. and D.K. about the identification if he had known about the cell phone lineup, strongly implies that he would have waited to charge the plaintiff until after the interview. And, what would that interview have established? Three things: (1) that J.N. and D.K. never positively identified the plaintiff in the cell phone lineup; (2) that J.N. and D.K. were exposed to an identical booking photo of the plaintiff prior to the second photo array (where the false identification occurred); and, (3) that the plaintiff *was not the perpetrator*—as was confirmed at the suppression hearing. In light of that information, the ADA could not have charged the plaintiff on the basis of Walker's statement, alone; indeed, ADA Potter explicitly states this in his deposition. (*See* Potter Dep. at 67:12-14 ). Thus, it is disingenuous to argue that "if all parties had known of some piece of exculpatory evidence"—here the images—"the prosecution would not have moved forward with the charges…or the trial court would have granted a motion to dismiss the indictment." *Mosley*, 614 F.3d at 397. *See also Kyles v. Whitley*, 514 U.S. 419, 433-438 ("[F]avorable evidence is material, and constitutional error results from its suppression by the government, if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.") (internal quotation marks omitted).

Furthermore, even assuming, *arguendo*, that the images themselves were not exculpatory standing alone, the defendants' position that Officer Ramirez's conduct here raises no constitutional concern is untenable. The defendants all but concede that Officer Ramirez: (1) destroyed the images (and concealed that fact); and (2) concealed J.N.'s inability to identify the plaintiff for nearly a month after the plaintiff was jailed. That conduct, without a doubt, ultimately caused the plaintiff to spend nearly five months in jail for a crime he did not commit. Even if the images were not materially exculpatory, standing alone (and J.N.'s failed identification was), the Court would still find that Officer Ramirez's joint destruction and concealment of evidence, which taken together caused the plaintiff's injury, runs afoul of *Brady. See Jones v. City of Chi.*, 856 F.2d 985, 994 (7th Cir. 1988) ("[A] prosecutor's decision to charge, a grand jury's decision to indict, a prosecutor's decision not to drop charges but to proceed to trial—none of these decisions will shield a police officer who deliberately supplied misleading information that influenced the decision.").

If that is the case—and the Court says *if* because it firmly believes that the photos themselves were exculpatory—then this case falls somewhere in between *Armstrong* and *Mosley*. Recall that in the latter, the Seventh Circuit left open the possibility that an acquitted defendant could bring a *Brady* claim if he could show: (1) that officer withheld materially favorable evidence; and (2) had that evidence been disclosed, it would have altered the decision to charge the defendant (or proceed to trial). *Mosley*, 614 F.3d at 397. Wherever this case falls, however, it implicates all of the concerns underlying *Brady* and its progeny; this, in turn, compels the court to find, under these facts, that a *Brady* violation occurred. *See United States v. Bagley*, 473 U.S. 667, 675 (1985) ("The *Brady* rule is based on the requirement of due process. Its purpose is

not to displace the adversary system as the primary means by which truth is uncovered, but to ensure that a miscarriage of justice does not occur."); *Jones v. City of Chi.*, 856 F.2d 985, 994 (7th Cir. 1988) (noting that constitutional concerns arise when officers "conceal[] from the prosecutors, and misrepresent[] to them, facts highly material to—that is, facts likely to influence—the decision whether to prosecute [the defendant] and whether (that decision having been made) to continue prosecuting him…").

Stated another way, the Court believes that if the Seventh Circuit were faced with prolonged detention caused by bad faith destruction of evidence (whether materially exculpatory, or apparently exculpatory), coupled with bad faith concealment of exculpatory evidence, as is the case here, the Seventh Circuit would find a *Brady* violation.

In that vein, the Court notes that Officer Ramirez's actions, taken together, would also meet the requirements set forth in *Tatum*. Namely: (1) the plaintiff was detained for an unusually long amount of time—nearly five months; (2) the plaintiff was detained due to Officer Ramirez's destruction of the images and failure to disclose J.N.'s false identification—which together were "significant exculpatory evidence," *id.* at 819; and, (3) the length of the plaintiff's detention was due to Officer Ramirez's culpable conduct—he intentionally destroyed the cell phone images, and, with reckless disregard for the plaintiff's rights, concealed both the destruction of the images and J.N.'s failure to make a positive identification during the cell phone lineup. *See* 768 F.3d at 819-20.

While it is true that a due process claim for prolonged detention has been foreclosed in the Seventh Circuit, *see Armstrong*, 786 F.3d at 555 ("[W]e have already rejected a plaintiff's due process challenge to the length of his pretrial detention after the prosecutor discovered strong exculpatory

evidence.") (citing *Garcia v. City of Chi.*, 24 F.3d 966, 971 (7th Cir. 1994)), *Garcia* did not involve a *Brady* claim, nor was the detention very prolonged at all—the defendant was detained for fifteen days. S*ee Garcia*, 24 F.3d at 971. Here, there is a *Brady* claim, and the plaintiff was detained for ten-times longer than the plaintiff in *Garcia*. Thus, in the Court's view, *Tatum*—which involves *Brady* concerns as well as a due process claim for prolonged detention—does not run afoul of *Garcia;* indeed, the Court finds the Ninth Circuit's reasoning in *Tatum* persuasive.

The irreducible truth from the foregoing discussion is that Officer Ramirez's conduct ran afoul of the constitution, no matter what test the Court applies.[6] And, rightly so, because any other conclusion would undermine the constitutional imperative that law enforcement preserve and promptly disclose exculpatory evidence. These requirements do not meaningfully impede the work of law enforcement;[7] they do, however, provide meaningful assurance that an innocent man will not spend almost five months in jail for a crime he did not commit. *Cf. Jones*, 856 F.2d at 995

---

[6]This conclusion is bolstered by questionable conduct of Officer Ramirez at all stages of the criminal case and this matter. In addition to the conduct noted above: (1) Officer Ramirez's memo book, which he knew was discoverable and could include information relevant to the plaintiff's criminal case and to this matter, was inexplicably lost (*see* Ramirez Dep. at 54:10-55:7); and (2) Officer Ramirez failed to appear for the second-half of the identification hearing, much to the chagrin of ADA Potter (*see* Potter Dep. at 101:9-25) ("It really surprised me that an officer, in the middle of all this controversy and turmoil, could forget about the need to come back. It was very clear he knew he was supposed to come back, and he didn't. Obviously, I wasn't too happy about that…").

[7]If the goal of the criminal justice system *is justice itself,* then the preservation and disclosure of *Brady* evidence will not impede law enforcement at all; indeed, the dictates of *Brady* and its progeny align with law enforcement imperatives by helping to ensure that those who are actually guilty are promptly arrested, charged, and prosecuted.

("*Brady v. Maryland* does not require the police to keep written records of all their investigatory activities; but attempts to circumvent the rule of that case by retaining records in clandestine files deliberately concealed from prosecutors and defense counsel cannot be tolerated.").

For all of the reasons noted above, the plaintiff is entitled to partial summary judgment (as to liability) on his *Brady* claim.

Finally, because the court has found that a *Brady* violation occurred, and the defendants have conceded that the right to be free from both "bad-faith destruction of potentially exculpatory evidence" and "destruction of evidence with apparent exculpatory value, even without bad faith," *see Armstrong*, 786 F.3d at 556, 557), was clearly established at the time of the events at issue here (*see* Docket #31 at 12), Officer Ramirez is not entitled to qualified immunity.

The measure of damages for Officer Ramirez's conduct will be decided by a jury.

### 3.2 The Court Will Deny the Defendants' Motion for Summary Judgment For Failure to Follow Local Rule 56(b)(1)(C)(iii)

As noted above, the defendants moved for summary judgment on all of the plaintiff's remaining claims—namely, his federal false arrest and malicious prosecution claims, and his state law false arrest/false imprisonment claim. However, the defendants' summary judgment motion was not accompanied by "a statement of proposed material facts as to which the moving party contends there is no genuine issue and that entitle the moving party to a judgment as a matter of law." Civil L.R. 56(b)(1)(C). And, the "failure to submit such a statement constitutes grounds for denial of the motion." Civil L.R. 56(b)(1)(C)(iii).

As such, the Court is obliged to deny, in its entirety, the defendants'
motion for summary judgment for failure to comply with the Civil Local
Rules governing summary judgment. And rightly so: the Seventh Circuit has
"emphasized the importance of local rules" and "consistently and repeatedly
upheld a district court's discretion to require strict compliance with its local
rules governing summary judgment." *Metro. Life Ins. Co. v. Johnson*, 297 F.3d
558, 562 (7th Cir. 2002) (internal quotation marks omitted); *accord Koszola v.
Bd. of Educ. of City of Chi.*, 385 F.3d 1104, 1109 (7th Cir. 2004); *Ammons v.
Aramark Uniform Servs., Inc.*, 368 F.3d 809, 817 (7th Cir. 2004); *Waldridge v. Am.
Hoechst Corp.*, 24 F.3d 918, 922 (7th Cir. 1994) (collecting cases); *see also
Midwest Imports, Ltd v. Coval*, 71 F.3d 1311, 1316 (7th Cir. 1995) ("[I]t is a
reasonable judgment on the part of [a] district court that strict, consistent,
'bright-line' enforcement is essential to obtaining compliance with [local]
rule[s] and to ensuring that long-run aggregate benefits in efficiency inure to
district courts.").

Because the plaintiff moved for summary judgment only on his *Brady*
claim, and the defendants' motion for summary judgment on all of the
plaintiff's claims will be denied, it follows that the remainder of the plaintiff's
claims under federal law must also proceed to a jury. Because the plaintiff
continues to have viable federal claims, the Court will also continue to
exercise supplemental jurisdiction over the plaintiff's state law claims, *see* 28
U.S.C. § 1367(a); accordingly, those claims, too, must proceed to a jury.

4.      CONCLUSION

For all of the foregoing reasons, the Court will grant the plaintiff's
motion for partial summary judgment (Docket #16). Specifically, the Court
grants the plaintiff summary judgment (as to liability) on his Fourteenth
Amendment claim; the issue of damages will be left for a jury. The Court will

deny the defendants' motion for summary judgment (Docket #23), for the reasons stated above. As such, the plaintiff's federal claims for false arrest and malicious prosecution will also proceed to a jury, as will the plaintiff's state law claim for false arrest/false imprisonment.

Accordingly,

IT IS ORDERED that the plaintiff's motion for partial summary judgment (Docket #16) be and the same is hereby GRANTED; and

IT IS FURTHER ORDERED that the defendants' motion for summary judgment (Docket #23) be and the same is hereby DENIED, as outlined above.

Dated at Milwaukee, Wisconsin, this 1st day of September, 2015.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge